¶1 This ease requires us to determine whether the Innovation Schools Act of 2008 (“ISA”), §§ 22-32.5-101 to -1⅛ C.R.S. (2016), precludes a local school board from approving an innovation plan submitted by a “new” innovation school, that is, a school that has not previously opened as a non-innovation school and has yet to hire teachers.[1] We hold that the ISA does not preclude approval of innovation plans from such “new” innovation schools. Accordingly, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶2 Between 2010 and. 2012, the Board of Education of School District No. 1 (“DPS Board”) approved and implemented innovation plans at eleven schools, under the ISA. Most of these schools were created to replace failing schools within the Denver Public Schools District (“DPS”). All of the schools were “new,” in that they had not previously been opened as non-innovation schools and had new names, new identification numbers, and employed only a principal and, in some eases, one or two other administrative employees — but had no students, teachers, or other employees at the time their innovation plans were approved.
¶3 Six of the eleven schools at issue here are in the far northeast area of Denver. They were created to replace failing schools in that area, including the former Montbello High School, For example, at Montbello High School, only seven percent’ of entering freshmen graduated four years later with the ability to enroll in higher education without remediation, while a thousand students from the area opted for very long bus rides so they could attend DPS high schools outside the area.
.¶4 In November 2010, after ten public meetings and- a final hearing lasting until 2 a.m., pursuant to its authority to close schools, the DPS Board voted for phased-out closures of Montbello High School and the area’s middle and elementary schools. See § 22-32-110(l)(Z), C.R.S. (2016); Hawkins v. Cline, 161 Colo. 141, 420 P.2d 400, 403 (1966). In their place, five new innovation schools were created to serve high school and middle school students: Denver Center, for International Studies at Montbello 6-12, Collegiate Prep Academy, High Tech Early College, Vista Academy (focused on high-risk youth), and Noel Community Arts Program 6-12. A sixth innovation school, the Denver Center for International Studies at Ford, was created to serve elementary school children in the area.
¶5 Two of the other schools at issue here, West Generation Academy and West Leadership Academy, replaced West High School and the middle school operating on the West campus. These schools serve grades six through twelve on the former West High School campus. In 2011, the DPS Board approved phased-out closures of West High School and the middle school. The resolution approving these closures cited the failings of both: West “had declining enrollment” as well as “the lowest graduation rate and highest remediation rate of any of [DPS’s] 'traditional high schools,” while the middle school was “Accredited on Probation and the lowest rated school on the District’s Performance Framework.”
,¶6 The final three new innovation schools challenged here are the Denver Center for 21st Century Learning at Wyman (“DC21”), Swigert International School, and McAuliffe International School.- DC21 was designed to re-engage high-risk youth facing problems such as gang involvement, substance abuse, pregnancy, and truancy. Swigert and McAu-liffe were created to address student popular *1222 tion growth in Denver’s Stapleton neighborhood.
¶7 After the DPS Board voted for phased-out closure of the old schools and the eleven new schools were created, the DPS Board approved the innovation plan for bach new school. In 2011 and 2012, the State Board of Education (“State Board”), pursuant to section 22-32.5-107(3), unanimously designated these eleven new schools. Then, teachers and other employees were hired to work in the eleven schools. Next, in the first week that each school opened, as provided in section 22-32.5-109(l)(b), the faculty at each new school voted on whether to waive the collective bargaining agreement (“CBA”) provisions identified in the innovation plans. Each of these secret-ballot votes resulted in far more than the requisite sixty percent support for the waivers of the CBA provisions. The teachers and staff at each school also voted on whether they supported their school’^ innovation plan. The majority of teachers and staff at each school voted in support of each innovation plan.
¶8 The Denver Classroom Teachers Association, the Denver Association of Educational Office Professionals, Lloyd Bourdon, Cheryl Myres,’an.d Toni Falcon (collectively, “the Association”) brought suit to challenge the DPS Board’s approval of the eleven new schools’ innovation plans. The district court upheld the innovation school designations except as to two schools in Stapleton — Swigert and McAuliffe — which it denied on the basis that those schools were not created “to address problems identified in chronically failing schools and failing student populations.” The court ruled that section 22-32.5-104(3)(f), which states that an innovation plan shall contain evidence that a majority of teachers, administrators, and the school accountability committee consent to the designation as an innovation school, was “inapplicable” to the remaining nine schools, noting that teachers showed “their approval of the Innovation Plan by agreeing to work at the school and signing a contract of employment at the school, knowing it was operating under an Innovation Plan, with an extended school day and year, other provisions imposing higher demands on the teachers, and statutory and CBA waivers.”
¶9 The Association appealed and argued that under section 104(3)(f), an innovation plan cannot be submitted to a local school board and the State Board without the prior majority consent of teachers, administrators, and the school accountability committee. In other words, it argued' that an innovation plan could only be submitted by an existing non-innovation school and could not be submitted by a school that had yet to hire teachers. The court of appeals agreed with the Association and reversed the designations except as to Swigert and McAuliffe— for those, it upheld the denial of the innovation designations, Denver Classroom Teachers Ass’n v. Denver Sch. Dist. No. 1, 2015 COA 71, ¶ 68, — P.3d -. DPS and the DPS Board appealed, and this court granted certiorari.
II. Analysis
¶10 The crux of the question presented by this case is, simply, can a local school board approve a “new” school’s innovation plan before the school hires teachers? We hold that it can, The General Assembly intended that the ISA give schools and school districts flexibility and autonomy to address the needs of students and the communities in which they live. Construing the ISA to preclude a local school board from approving innovation plans from “new” schools that had not previously opened as non-innovation schools and had yet to hire teachers would be directly contrary to this intent. Moreover, given this intent, we construe section 104(3)(f) to be directory and inapplicable to such “new” innovation schools.. Accordingly, we hold that the ISA does not preclude a local school board from approving innovation plans from schools that have not previously opened as non-innovation schools and have yet to hire teachers.
A. Standard of Review and Statutory Construction
¶11 We review issues of statutory construction de novo. Specialty Rests. Corp. v. Nelson. 231 P.3d 393, 397 (Colo. 2010). In interpreting a statute, our primary objective *1223 is to ascertain and effectuate the intent of the General Assembly. Id. In making this determination, we presume that the General Assembly intended a just and reasonable result, and we consider the - consequences of a particular construction. Bd. of Cty, Comm’rs of Cty. of Park v. Park Cty. Sportsmen’s Ranch. LLP, 45 P.3d 693, 711 (Colo. 2002). “Perhaps the best guide to intent is the declaration of policy which frequently forms thé initial part of an enactment.” St. Luke’s Hosp. v. Indus. Comm’n, 142 Colo, 28, 349 P.2d 995, 997 (1960).
¶12 Additionally, a “statute should be given the construction and interpretation which will render it effective in accomplishing the purpose for which it was enacted.” Zaba v. Motor Vehicle Div., Dep’t of Revenue. 183 Colo. 335, 516 P.2d 634, 637 (1973). We also “read the statutory design as a whole, giving consistent, harmonious, and sensible effect to all of its parts.” Young v. Brighton Sch. Dist. 27J, 2014 CO 32, ¶ 11, 325 P.3d 571, 576. But we should avoid constructions that lead to illogical or absurd results. Johnson v. People, 2016 CO 59, ¶ 18, 379 P.3d 323, 327.
B. The Innovation Schools Act
¶13 The legislative declaration of the ISA explains that the General Assembly recognized a need to grant principals, faculty, and school districts the “maximum degree of flexibility possible to meet the needs of individual students and the communities in which they live.” § 22-32.5-102(l)(d). The legislative declaration also explains that districts should “delegate to each public school a high degree of autonomy in implementing curriculum, making personnel decisions, [and] organizing the school day” (among other things)— “thereby empowering eách public school to tailor its services most effectively and efficiently to meet the needs of the population of students it serves.” § 22-32.5-102(l)(e).
¶14 To effectuate its purposes, the ISA created a system that allows a public school to submit an “innovation plan” to its local school board for approval. § 22-32.5-104(l)(a)-(b). The plan should describe the “innovations” the public school would like to implement, which may include changes to, among other things, the length of the school day and year, the curriculum, and teacher hiring and compensation. § 22-32.5-104(3)(b)~ (c)., If the local school board approves- the plan, it-may seek designation by the State Board as a district of innovation on the basis of the submitted plan or plans as the case maybe. § 22-32.5-107(1).
¶15 Because submitted innovation plans may require changes that otherwise would be precluded by state statutes, district rules, and CBA provisions, designation by the State •Board has the important consequence of relieving the designated innovation schools from a number of these restrictions. Specifically, upon designation, “the [S]tate [B]oard shall waive any statutes or rules specified in the school district’s innovation plan” other than specified statutes not subject to waiver. § 22-32.5-108(1). However; if the innovation plan contains a provision that attempts .to waive any CBA provisions, any such waiver will only be effective upon “obtaining the approval, by means of a secret ballot vote, of at least sixty percent of the members of the collective bargaining unit who- are employed at the innovation school,” § 22-32.6-109(l)(b).
¶16 In addition, section 104(3) gives specific direction about the contents of innovation plans. That section states, among other things, that plans must provide evidence that a majority of teachers employed at the school consent to designation as an innovation school. § 22-32.6-104(3)(f). However, the statute imposes no substantive restrictions on a local school board’s authority to approve or disapprove innovation plans, § 22-32.5-104(1), and the State Board must designate for innovation unless a plan is likely to’ result in a decrease in academic performance or is not fiscally feasible, § 22-32.5-107(3) (a)(I)-(II).
C. The Innovation Schools Act and “New” Schools
¶17 Nothing in the ISA. precludes a local school board from approving an innovation plan from a school that has not previously been open as a non-innovation school and has yet to hire teachers (i.e., a “new” school). Yet,, the Association argues that we should read such a preclusion into the ISA because, *1224 under its logic, a local school board cannot approve an innovation plan that fails to meet the requirements of section 104(3)(f). It argues that by specifically requiring the consent of teachers, section 104(3)(f) presumes the existence of an operating school, and as such, a local school board cannot approve an innovation plan from a school without teachers. However, section 104(3)(f) is far too slender a reed on which to base reading an implied preclusion into the ISA.
¶18 We must “read the statutory design as a whole” in order “to ascertain and give effect to the legislature’s intent.” Young, ¶ 11, 325 P.3d at 576. Rather than read any one statutory provision in isolation, we examine the provision in the context of the statute as a whole and strive to give consistent, harmonious, and sensible effect to all parts of the statute. Id. Thus, we can only read section 104(3)(f) in the overall context of the ISA and in light of the ISA’s purposes. The clear purpose of . the ISA is to allow schools and school. districts the flexibility and autonomy to address the needs of students and the communities in which they live. See § 22-32.5-102(l)(a), (c)-(e). Thus, the ISA was intended as an empowerment of, not a restriction upon, local school districts. Construing section 104(3)(f) to preclude “new” innovation schools undercuts this intended empowerment and flexibility. If section 104(3)(f) precludes the creation of “new” innovation schools, a school will be required to first open as a non-innovation school before it can submit an innovation'plan. Such delay would be inimical to the interests of all students, especially to those from failing school districts, and contrary to the purposes of the ISA. Additionally, this would be a severe limitation oh a local district’s flexibility and is therefore out of line with the intent of the General Assembly.
¶19 Moreover, the State Board cannot legally deny innovation status to “new” schools simply because their innovation plans lack section 104(3)(f) information; See § 22-32.5-107(3)(a). Instead, the State Board is limited to reviewing only academic and fiscal issues. See § 22-32.5-107(3)(a)(IMII). Thus, a restrictive reading of 104(3)(f) leads to an illogical construction of the ISA, namely that section 104 would invalidate a local school board’s approval of new schools, but section 107 would require the State Board to designate those “improperly” approved schools. This reading contravenes the requirement that courts construe statutes, wherever possible, to avoid these sorts of illogical results. See Johnson, ¶ 18, 379 P.3d at 327.
¶20 In any event, as applied to “new” schools, section 104(3)(f) is directory rather than mandatory. A “ ‘directory’ provision in a statute is one, the observance of which is not necessary to the validity of the proceeding to which it relates” and “involving no invalidating consequence for its disregard.” Directory, Black’s Law Dictionary (6th ed. 1990); see also Directory Statute, Black’s Law Dictionary (10th ed. 2014) (“A law that indicates only what should be done, with no provision for enforcement.”). The distinction between a “directory” and a “mandatory” provision— that is, whether noncompliance invalidates the action — turns on “legislative intent.” Protest of McKenna, 2015 CO 23, ¶ 19, 346 P.3d 35, 41. Section 104(3)(f) — which is silent as to the consequences of not providing the information and does not address how a school that lacks teachers, administrators, and/or a school accountability committee could possibly submit a valid innovation plan — cannot trump the broader purposes and intent of the statute: those of “preserving local flexibility” and providing the “maximum degree of flexibility” in “empowering each public school” to innovate. § 22-32.5-102(l)(a)-(e). Construing section 104(3)(f) as mandatory and implicitly prohibiting “new” innovation schools would defeat the ISA’s manifest purposes of encouraging innovation and flexibility. Ultimately, then, the section 104(3)(f) informational provision is directory and inapplicable to plans involving “new” schools.
¶21 In sum, we hold that the ISA does not preclude a local school board from approving an innovation plan from a school that has not previously opened as a non-innovation school and has yet to hire teachers. Instead, a local school board can approve an innovation plan that does not include information discussed in section 104(3)(f).
*1225 III. Conclusion
¶22 We hold that the ISA does not preclude a local school board from approving innovation plans from new innovation schools that have not previously opened as non-innovation schools and have yet to hire teachers. Accordingly, the judgment of the court of appeals is reversed as to all eleven new schools." We remand for further proceedings consistent with this opinion.
CHIEF JUSTICE RICE announced the judgment of the Court and delivered an opinion, in which JUSTICE BOATRIGHT joins.
JUSTICE EID concurs in the judgment, and JUSTICE COATS joins in the concurrence in the judgment.
JUSTICE GABRIEL dissents, and JUSTICE MÁRQUEZ and JUSTICE HOOD join in the dissent.

. We granted certiorari on the following issue:
Whether the Innovation Schools Act,' §§ 22-32.5-101 to -111, C.R.S. (2016), precludes new innovation schools, which were not previously opened as nondnnovation schools, because section 104(3)(f) of the Act requires that innovation plans include information regarding teacher support.