Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
March 12, 2018

**2018 CO 17**

**No. 15SA281, <u>Johnson v. Sch. Dist. No. 1</u> — Public Employment — Education.**

In this case, the supreme court considers two certified questions from the United States Court of Appeals for the Tenth Circuit. The first is whether the unpaid-leave provisions of section 22-63-202(2)(c.5), C.R.S. (2017), apply to all nonprobationary teachers who are not employed in a "mutual consent" placement, or only to those who are displaced for the reasons enumerated in section 22-63-202(2)(c.5)(VII). The second is whether a nonprobationary teacher who is placed on unpaid leave under section 22-63-202(2)(c.5)(IV) is deprived of a state property interest in salary and benefits. The supreme court holds that the provisions of section 22-63-202(2)(c.5) apply to all displaced nonprobationary teachers, not just nonprobationary teachers who are displaced because of a reason stated in section 22-63-202(2)(c.5)(VII). The supreme court further holds that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits, meaning a nonprobationary teacher who is placed on unpaid leave under section 22-63-202(2)(c.5)(IV) is not deprived of a state property interest.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

### 2018 CO 17

### Supreme Court Case No. 15SA281

*Certification of Questions of Law*
United States Court of Appeals for the Tenth Circuit Case No. 14-1410

#### Plaintiff-Appellant:

Lisa M. Johnson,

v.

#### Defendants-Appellees:

School District No. 1 in the County of Denver and State of Colorado and Board of Education of School District No. 1 in the County of Denver and State of Colorado.

#### Certified Questions Answered

*en banc*
March 12, 2018

**Attorneys for Plaintiff-Appellant:**
Colorado Education Association
Kris Gomez
Sharyn E. Dreyer
  *Denver, Colorado*

National Education Association
Alice O'Brien
Eric A. Harrington
  *Washington, DC*

**Attorneys for Defendants-Appellees:**
Semple, Farrington & Everall, P.C.
M. Brent Case
Holly Ortiz
Jonathan P. Fero
Mary B. Gray
  *Denver, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.[*]

**JUSTICE GABRIEL** concurs in part and dissents in part, and **JUSTICE HOOD** and **JUSTICE HART** join in the concurrence in part and dissent in part.

---

[*] This opinion was originally assigned to another justice but was reassigned to Justice Boatright on November 3, 2017.

¶1 We accepted jurisdiction over two certified questions of law from the United States Court of Appeals for the Tenth Circuit.[1] See C.A.R. 21.1. The questions stem from an action brought by teacher Linda Johnson against Denver School District No. 1 ("the District") and the District's Board of Education, in which Johnson argues that by placing her on unpaid leave, the District breached her contract and violated her due process rights. The federal district court concluded that because Johnson was placed on unpaid leave, rather than terminated, she was not deprived of a property interest. Johnson v. Sch. Dist. No. 1, No. 12-CV-02950-MSK-MEH, 2014 WL 4462999, at *5–6 (D. Colo. Sept. 10, 2014). Johnson appealed that decision to the Tenth Circuit, which then certified the questions of law to us.

¶2 To answer the certified questions we examine the history of and the amendments to the statutes governing the processes for teacher hiring, transfer, and termination. In particular, we look to whether paragraph (c.5) in section 22-63-202(2), C.R.S. (2017)— which provides in subparagraph (IV) that a district may place nonprobationary teachers who are unable to secure a mutual-consent assignment on unpaid leave—applies either (1) to all nonprobationary teachers, or (2) only to those who are displaced for certain

---

[1] We accepted jurisdiction to review the following issues:

1. Whether the provisions of section 22-63-202(2)(c.5), C.R.S. (2015), apply to all nonprobationary teachers who are not employed in a "mutual consent" placement, or whether subsection (c.5) governs only those nonprobationary teachers who are displaced for the reasons stated in section 22-63-202(2)(c.5)(VII), C.R.S. (2015).
2. Whether a nonprobationary teacher, not dismissed but instead placed on unpaid leave under section 22-63-202(2)(c.5)(IV), C.R.S. (2015), is deprived of a state property interest in salary and benefits.

reasons enumerated in subparagraph (VII), which can be characterized as enrollment- or program-based decisions. We also look to whether a nonprobationary teacher placed on unpaid leave has a property interest in salary and benefits such that her placement on unpaid leave deprives her of a state property interest. After analyzing the statutory history and the current statutory language, we hold that the provisions of section 22-63-202(2)(c.5) apply to all displaced nonprobationary teachers, not just nonprobationary teachers who are displaced because of a reduction in enrollment or an administrative decision to eliminate certain programs—that is, the reasons stated in subparagraph (VII). We further hold that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits, meaning a nonprobationary teacher who is placed on unpaid leave under subparagraph (IV) is not deprived of a state property interest.

## I. Facts and Procedural History

¶3     Over fifty years ago, the General Assembly enacted the Teacher Employment, Dismissal, and Tenure Act of 1967 ("TEDTA"). Ch. 435, sec. 1, §§ 123-18-1 to -18, 1967 Colo. Sess. Laws 976. Among other things, TEDTA reaffirmed the then-existing status of a "tenure teacher" that had been codified in the Teacher Tenure Act of Colorado, ch. 212, sec. 3, 1953 Colo. Sess. Laws 559, 559–60. § 22-63-102(11), C.R.S. (1988).[2] Under TEDTA, a teacher who maintained continuous employment in the same school district for three academic years became tenured upon being retained for a fourth academic

---

[2] We cite to the 1988 Colorado Revised Statutes when discussing TEDTA because in that year, as today, the relevant provisions were codified in title 22, whereas in some earlier years they were codified elsewhere.

4

year.  § 22-63-112(1), C.R.S. (1988).  With limited exceptions, a tenured teacher was "entitled to a position of employment as a teacher" during her continuous service in the district where she became tenured.  § 22-63-115(1), C.R.S. (1988).  TEDTA permitted dismissal of a tenured teacher only for certain, enumerated reasons that qualify as good cause:

> The grounds for dismissal of a tenure teacher shall be physical or mental disability, incompetency, neglect of duty, immorality, conviction of a felony or the acceptance of a guilty plea or a plea of nolo contendere to a felony, insubordination, or other good and just cause.  No tenure teacher shall be dismissed for temporary illness, leave of absence previously approved by the board, or military leave of absence pursuant to article 3 of title 28, C.R.S.

§ 22-63-116, C.R.S. (1988).  TEDTA also established procedures to dismiss a tenured teacher.  See § 22-63-117(1)–(11), C.R.S. (1988).  TEDTA remained the law for more than twenty years.

¶4 But the General Assembly supplanted TEDTA by enacting the Teacher Employment, Compensation, and Dismissal Act of 1990 ("TECDA").  Ch. 150, sec. 1, §§ 22-63-101 to -403, 1990 Colo. Sess. Laws 1117.  Unlike its predecessor, TECDA did not define "tenure teacher"; in fact, it mentioned the word "tenure" only once (and in a manner irrelevant to the questions before us).[3]  Compare §§ 22-63-101 to -118, C.R.S. (1988), with §§ 22-63-101 to -403, C.R.S. (1990).  Instead, TECDA created a distinction between "probationary" and "nonprobationary" teachers, defining the former as "a

---

[3] Specifically, TECDA required that a committee to study teacher employment and compensation issues include as a member "[o]ne person from the business community knowledgeable about teacher employment and tenure issues."  § 22-63-104(III)(E), C.R.S. (1990).

5

teacher who has not completed three full years of continuous employment with the employing school district and who has not been reemployed for the fourth year." § 22-63-103(7), C.R.S. (1990). But TECDA retained TEDTA's language on transferring teachers within a school district, providing that "[a] teacher may be transferred upon the recommendation of the chief executive officer of a school district from one school . . . to another within the school district," so long as the teacher is qualified for her new position and does not suffer a salary reduction. Compare § 22-63-114(1), C.R.S. (1988), with § 22-63-206(1), C.R.S. (1990). And it retained for-cause grounds for teacher dismissal and a dismissal procedure. See §§ 22-63-301 to -302, C.R.S. (1990).

¶5    Twenty years after it enacted TECDA, the General Assembly enacted Senate Bill 10-191 ("SB 191"). Ch. 241, 2010 Colo. Sess. Laws 1053. As relevant here, SB 191 amended the TECDA sections that pertain to employment contracts and teacher transfer. To the section that governs employment contracts, section 22-63-202, SB 191 added paragraph (c.5). Under that new paragraph, "each employment contract . . . shall contain a provision stating that a teacher may be assigned to a particular school only with the consent of the hiring principal and with input from at least two teachers employed at the school." § 22-63-202(2)(c.5)(I), C.R.S. (2017). SB 191 labels such an assignment a "mutual consent assignment." E.g., § 22-63-202(2)(c.5)(IV). Also under paragraph (c.5), nonprobationary teachers who have not secured a mutual-consent assignment but who were deemed effective during the prior school year become members of a "priority hiring pool," ensuring them the first opportunity to interview for a "reasonable number of available positions for which [they are] qualified in the

6

school district." § 22-63-202(2)(c.5)(III)(A). But if a nonprobationary teacher fails to secure a position after the longer of twelve months or two hiring cycles, the teacher is placed on unpaid leave until she secures an assignment.[4] § 22-63-202(2)(c.5)(IV). Finally, subparagraph (VII) of paragraph (c.5) provides that this new paragraph "shall apply to any teacher who is displaced as a result of drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution." § 22-63-202(2)(c.5)(VII).

¶6 Furthermore, to the section that governs teacher transfer, section 22-63-206, SB 191 made a single alteration: the addition of subsection (5). In that subsection, the General Assembly clarified that "[n]othing in [section 22-63-206] shall be construed as requiring a receiving school to involuntarily accept the transfer of a teacher. All transfers to positions at other schools of the school district shall require the consent of the receiving school." § 22-63-206(5), C.R.S. (2017).

¶7 In sum, TECDA—the law in effect since 1990, as amended by SB 191 in 2010—is devoid of tenure-related language. See §§ 22-63-101 to -403. It instead distinguishes between "probationary" and "nonprobationary" teachers, § 22-63-103(7), and lacks any system of forced teacher placement. Indeed, under TECDA's mutual-consent assignment process, teacher contracts shall provide that a "teacher may be assigned to a particular school only with the consent of the hiring principal and with input from at least two teachers employed at the school." § 22-63-202(2)(c.5)(I). A teacher who is unable to secure a mutual-consent assignment for the longer of twelve months or two

---

[4] SB 191 does not define "unpaid leave."

hiring cycles is placed on unpaid leave. § 22-63-202(2)(c.5)(IV). The unpaid-leave provision is the focal point of the questions before us.

¶8 Lisa Johnson, the plaintiff in the federal action, argues that a nonprobationary teacher who is placed on unpaid leave pursuant to SB 191's provisions suffers a breach of contract under TECDA and a deprivation of due process. Johnson is a nonprobationary teacher who has taught for the District since 1991.[5] In June 2008, the District issued a written recommendation to dismiss Johnson from the Godsman Elementary School for performance-related reasons. Following a hearing, an administrative law judge entered an order recommending that the District retain Johnson. The District, in response, entered an order retaining Johnson for a one-year probationary period.[6] It then assigned Johnson to a temporary, one-year position for the 2009–10 school year. During that year, Johnson unsuccessfully applied for a long-term position through the District's school-based hiring process. The District assigned Johnson to a second one-year position at the same school for the 2010–11 school year, during which time she was again unable to obtain a long-term position through the District's school-based hiring process. The District assigned her to yet another temporary position at a different school for the 2011–12 school year. When Johnson was

---

[5] We take these facts from the Tenth Circuit's order certifying questions of law to us and from Johnson's second amended complaint.

[6] TECDA provides that, after receiving the hearing officer's entry of a written order with findings and recommendations, the school board may dismiss the teacher, retain her, or place her on a one-year probation. § 22-63-302(9), C.R.S. (2017).

again unable to obtain a long-term position in 2012, the District placed her on unpaid leave pursuant to section 22-63-202(2)(c.5)(IV).

¶9 In response, Johnson filed suit in the U.S. District Court for the District of Colorado against the District and the District Board of Education, alleging that they violated TECDA and thus breached her contract by not following the dismissal process that nonprobationary teachers are entitled to. She also alleged that their actions violated her due process rights.

¶10 The district court granted the District's motion to dismiss these claims, concluding that the District was authorized to place Johnson on indefinite unpaid leave pursuant to TECDA section 22-63-202(2)(c.5)(IV), and that the District did not deprive Johnson of a property interest because she was not terminated, but was instead placed on unpaid leave. Johnson appealed to the Tenth Circuit, which certified two questions of law to us. We accepted jurisdiction and now answer those questions.

## II. Standard of Review

¶11 "We review issues of statutory construction de novo." City & Cty. of Denver Sch. Dist. No. 1 v. Denver Classroom Teachers Ass'n, 2017 CO 30, ¶ 11, 407 P.3d 1220, 1222. Our goal in construing a statute is to give effect to legislative intent. People v. Hoskin, 2016 CO 63, ¶ 7, 380 P.3d 130, 133.

## III. Analysis

¶12 We first examine paragraph (c.5) to determine whether it applies to all displaced nonprobationary teachers, or only those who are displaced for the reasons enumerated in subparagraph (VII). Reading section 22-63-202(2)(c.5) as a whole, we hold that the

9

provisions of section 22-63-202(2)(c.5) apply to all displaced nonprobationary teachers, not just nonprobationary teachers who are displaced for the reasons stated in subparagraph (VII). We then consider whether a nonprobationary teacher who is not dismissed but instead placed on unpaid leave under section 22-63-202(2)(c.5)(IV) is deprived of a state property interest in salary and benefits. After analyzing the General Assembly's omission of protective, tenure-related language in TECDA, we hold that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits, meaning a nonprobationary teacher who is placed on unpaid leave under subparagraph (IV) is not deprived of a state property interest.

## A. Section 22-63-202(2)(c.5) Applies to All Displaced Nonprobationary Teachers

¶13 The first certified question is whether section 22-63-202(2)(c.5) applies to all nonprobationary teachers not employed in a "mutual consent" placement, or only to those displaced because of enrollment- or program-based decisions.

¶14 As we have explained, section 22-63-202(2)(c.5)(I) requires teacher contracts to provide that the teacher will be assigned to a school only with the consent of the receiving principal. A nonprobationary teacher who is unable to secure a mutual-consent assignment at a school is, under subparagraph (IV), placed on unpaid leave until she secures such an assignment. Subparagraph (VII) further provides: "This paragraph (c.5) shall apply to any teacher who is displaced as a result of drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution." The issue now before us is whether

10

subparagraph (VII) limits paragraph (c.5)'s applicability to only those teachers displaced for a reason enumerated in this subparagraph.

¶15    Read in isolation, subparagraph (VII) does not clarify whether paragraph (c.5) applies only to teachers displaced for the enumerated reasons, or if it applies to all displaced nonprobationary teachers who are unable to obtain a position through the mutual-consent process.  We must therefore resort to other tools of statutory construction to resolve the question.

¶16    Johnson urges us to apply the canon of expressio unius est exclusio alterius — under which "the inclusion of certain items implies the exclusion of others," Beeghly v. Mack, 20 P.3d 610, 613 (Colo. 2001) — and hold that because the General Assembly chose to enumerate specific instances in which paragraph (c.5) applies, its intent was for the paragraph to apply only in those circumstances.  Specifically, Johnson argues that subparagraph (VII) created an exhaustive list of grounds for which a teacher may be placed on indefinite, unpaid leave.  She contends that if the General Assembly intended for subparagraph (VII) to be non-exhaustive, it would have written the subparagraph differently, perhaps by using the language "including, but not limited to," before listing the specific grounds for placement on unpaid leave.

¶17    Like other canons of construction, expressio unius is a tool for ascertaining the General Assembly's intent, but it should not be applied where doing so would undermine that intent.  See Sheely v. People, 129 P. 201, 202 (Colo. 1913) ("[Canons of construction] can be used only to aid the courts in ascertaining the legislative intent . . . . If they do not afford any aid, they are not to be resorted to.").  Indeed, the canon of

11

*expressio unius* has its limits and "properly applies only when the *unius* . . . can reasonably be thought to be an expression of <u>all</u> that shares in the grant or prohibition involved." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 107 (2012). In other words, the canon applies only when the list is exhaustive. And like any other canon, it must yield where its application would render other statutory language meaningless. <u>See</u> <u>Pineda-Liberato v. People</u>, 2017 CO 95, ¶ 39, 403 P.3d 160, 166 ("We cannot . . . interpret statutory provisions so as to render any of their words or phrases meaningless or superfluous."). Our review of TECDA reveals that applying <u>expressio unius</u> here would fail to give effect to the entire statute for three reasons.

¶18     First, the General Assembly did not expressly provide that a district may place a nonprobationary teacher on unpaid leave, as specified in subparagraph (IV), <u>only</u> when a teacher is displaced for the reasons enumerated in subparagraph (VII). Such a reading would be contrary to—and would in fact nullify—subparagraph (I) of paragraph (c.5), where the General Assembly unambiguously required each employment contract to provide that "a teacher may be assigned to a particular school <u>only with</u> the consent of the hiring principal and with input from at least two teachers employed at the school." § 22-63-202(2)(c.5)(I) (emphasis added). Had the General Assembly used similarly restrictive language in subparagraph (VII), then we could similarly conclude that paragraph (c.5) applies only in the enumerated circumstances. But the General Assembly chose not to do so.

12

¶19   Second, the General Assembly made clear that the express purpose of paragraph (c.5)'s mutual-consent requirement is to facilitate "the fair evaluation of a principal based on the demonstrated effectiveness of his or her teachers." § 22-63-202(2)(c.5)(I). Reading paragraph (c.5) to apply only to teachers displaced for the reasons enumerated in subparagraph (VII) (e.g., a drop in enrollment) would undermine that express purpose and leave no process to place teachers who have been displaced for reasons not specified in subparagraph (VII). Assigning a displaced teacher to another school without the consent of the receiving school presumably impacts the fair evaluation of a principal, regardless of whether the teacher was initially displaced for those enumerated reasons. Indeed, under Johnson's proposed construction of the statute, a school would not have to receive a nonprobationary teacher who had been displaced as a result of a drop in enrollment, but would have to receive one who was displaced for cause. That would be an absurd result. See Frazier v. People, 90 P.3d 807, 811 (Colo. 2004) ("A statutory interpretation leading to an illogical or absurd result will not be followed.").

¶20   Third, the General Assembly required that a nonprobationary teacher shall be notified of her removal when it is determined that her services "are no longer required for the reasons set forth in subparagraph (VII) of this paragraph (c.5)." § 22-63-202(2)(c.5)(III)(B). Had the legislature intended subparagraph (VII) to limit the applicability of paragraph (c.5), it would have been unnecessary to specify that the notification requirements in subparagraph (III)(B) apply only when a nonprobationary teacher is displaced for the reasons enumerated in subparagraph (VII). See Kinder

13

Morgan CO2 Co. v. Montezuma Cty. Bd. of Comm'rs, 2017 CO 72, ¶ 24, 396 P.3d 657, 664 ("We strive to avoid statutory interpretations that render certain words or provisions superfluous or ineffective.").

¶21    So instead of applying expressio unius, as Johnson urges, we find the whole-text canon—under which we "consider the entire text, in view of its structure and of the physical and logical relation of its many parts," Scalia & Garner, supra, at 167—to be a better vehicle with which to examine section 22-63-202. Reading that section as a whole, we hold that section 22-63-202(c.5) applies to all displaced nonprobationary teachers, not merely to those displaced for the reasons enumerated in section 22-63-202(c.5)(VII).

¶22    We recognize that, in Johnson's view, reading paragraph (c.5) to allow any teacher to be placed on unpaid leave renders subparagraph (VII) meaningless, because a district "would not have to show cause or rely on the lay-off procedure to dismiss teachers," and could merely withdraw mutual consent. Opening Br. 21. But this argument overlooks the differences between dismissal and placement on unpaid leave. A nonprobationary teacher who is placed on unpaid leave, unlike one who is dismissed, is entitled to various benefits: If she is placed on unpaid leave for a reason enumerated in subparagraph (VII), the district "shall immediately provide [her] with a list of all vacant positions for which [she] is qualified, as well as a list of vacancies in any area identified by the school district to be an area of critical need," § 22-63-202(2)(c.5)(III)(B); and if she secures an assignment within the district while on unpaid leave, "the school district shall reinstate [her] salary and benefits at the level they would have been if [she] had not been placed on unpaid leave," § 22-63-202(2)(c.5)(IV). Johnson's argument also

14

misses the purpose of SB 191's unpaid-leave provisions, which—as several current and former legislators argued in an amicus brief filed in a related case—is to ensure that only the best teachers are in the classroom:

> S.B. 191's new system is one of mutual consent: both the displaced teacher and the principal of the new school must agree that the hire is the right fit. A non-probationary teacher has multiple opportunities to earn a position based on merit. If that effort proves unsuccessful, the school district may place the teacher on unpaid leave.

Amended Amicus Curiae Brief of Senator Michael Johnston et al. at 6, Sch. Dist. No. 1 v. Masters, 2018 CO 18, __ P.3d __ (citation omitted). Accordingly, we disagree that reading paragraph (c.5) to apply to all displaced teachers renders subparagraph (VII) meaningless.

¶23 We turn now to the second certified question.

## B. Nonprobationary Teachers Who Are Placed on Unpaid Leave Do Not Have a Property Interest in Salary and Benefits Under TECDA

¶24 The second certified question is narrow: Whether a nonprobationary teacher who is not dismissed but instead placed on unpaid leave under section 22-63-202(2)(c.5)(IV) is deprived of a state property interest in salary and benefits. Hence, we need not address the entire breadth of the relevant amendments. That said, we conclude that, because TECDA eliminated the word "tenure" and other entitlement and durational language, a nonprobationary teacher has no vested property interest in salary and benefits. We therefore hold that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits, meaning a

15

nonprobationary teacher who is placed on unpaid leave under subparagraph (IV) is not deprived of a state property interest.

¶25 The United States Constitution prohibits states from depriving any person of property without due process of law. U.S. Const. amend. XIV. If, as Johnson contends, Colorado's nonprobationary teachers have a property interest in continued employment, the General Assembly "could not deprive them of this property without due process." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).

¶26 Neither the United States Constitution nor the Colorado Constitution defines what constitutes property for the purposes of due process. Rather, the constitutions protect property interests that are "defined by existing rules or understandings that stem from an independent source such as state law." Dove Valley Bus. Park Assocs. v. Bd. of Cty. Comm'rs, 945 P.2d 395, 401 (Colo. 1997) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)); Phillips v. Washington Legal Found., 524 U.S. 156, 163–64 (1998). It follows that a property interest does not arise from a "mere unilateral expectation" or an "abstract need." Webb's Fabulous Pharmacies, 449 U.S. at 161.

¶27 Here, TECDA creates no such property interest. Whereas TECDA's predecessor statute was titled the "Teacher Employment, Dismissal, and Tenure Act of 1967" (emphasis added) and used the term "tenure" throughout, TECDA makes no similar reference to tenure. Compare §§ 22-63-101 to -118, C.R.S. (1988), with §§ 22-63-101 to -403, C.R.S. (1990). We have described "tenure" as a condition which "by its nature engenders a reasonable and objective expectancy of continued employment." Howell

16

v. Woodlin Sch. Dist. R-104, 596 P.2d 56, 60 (Colo. 1979), overruled on other grounds by deKoevend v. Bd. of Educ., 688 P.2d 219 (Colo. 1984). The General Assembly's decision to omit the formerly prevalent word "tenure" from TECDA indicates its intent to eliminate that expectancy.

¶28 The General Assembly's removal of entitlement and durational language in TECDA that was present in TEDTA further evinces this intent. TEDTA guaranteed that a tenured teacher "shall be entitled to a positon of employment as a teacher." § 22-63-115, C.R.S. (1988). The Supreme Court has found such entitlement language instructive in finding the existence of state-law property interests. See Loudermill, 470 U.S. at 538 (concluding that a statute "plainly" created a property interest when employees were "classified civil service employees, entitled to retain their positions during good behavior and efficient service, who could not be dismissed except" for certain enumerated reasons). But in 1990 TECDA affirmatively removed this language. We read this amendment to have meaning: "A legislative amendment either clarifies or changes existing law, and we presume that by amending the law the legislature has intended to change it." City of Colo. Springs v. Powell, 156 P.3d 461, 465 (Colo. 2007). We therefore conclude that by removing entitlement and durational language in TECDA, the General Assembly intended to eliminate any property interest in salary and benefits.

¶29 Accordingly, we hold that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits, meaning a

17

nonprobationary teacher who is placed on unpaid leave under subparagraph (IV) is not deprived of a state property interest.

## IV. Conclusion

¶30    We hold that section 22-63-202(2)(c.5) applies to all displaced nonprobationary teachers, and that a nonprobationary teacher who is placed on unpaid leave under section 22-63-202(2)(c.5)(IV) is not deprived of a state property interest in salary and benefits. Having thus answered the certified questions, we now return the case to the Tenth Circuit.

**JUSTICE GABRIEL** concurs in part and dissents in part, and **JUSTICE HOOD** and **JUSTICE HART** join in the concurrence in part and dissent in part.

JUSTICE GABRIEL, concurring in part and dissenting in part.

¶31 I fully agree with the majority's conclusion that nonprobationary teachers who are placed on unpaid leave have no vested property interest in salary and benefits and that therefore, plaintiff Lisa M. Johnson was not deprived of a state property interest in this case. I cannot, however, agree with the majority's construction of section 22-63-202(2)(c.5), C.R.S. (2017).

¶32 After unsuccessfully seeking to dismiss Johnson, a nonprobationary teacher with over twenty years of experience, defendant School District No. 1 (the "District") ultimately placed her on indefinite leave without pay, notwithstanding the fact that she was not "displaced as a result of drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution" pursuant to section 22-63-202(2)(c.5)(VII).

¶33 This case now asks us to decide whether a nonprobationary teacher like Johnson, who was assigned to a school upon the mutual consent of the school and herself, can be displaced (as opposed to terminated) based on the school's determination that she was no longer meeting the school's goals, or whether she may only be displaced for the reasons set forth in section 22-63-202(2)(c.5)(VII). The majority concludes that section 22-63-202(2)(c.5) applies to all nonprobationary teachers who are not employed in mutual consent placements. See maj. op. ¶¶ 2, 12, 21. Thus, in the majority's view, a school may place a teacher like Johnson on indefinite leave without pay whenever the school withdraws its consent to placement, as opposed to only in the circumstances set

19

forth in section 22-63-202(2)(c.5)(VII). See id. Because I believe that the majority misconstrues section 22-63-202(2)(c.5), I disagree with these conclusions.

¶34 Accordingly, I respectfully concur in part and dissent in part from the majority's opinion.

## I. Factual Background

¶35 The majority lays out most of the pertinent facts, and I need not repeat those facts here. I, however, highlight certain of the facts leading up to the events at issue because I believe that those facts are necessary for a complete understanding of the parties' motives and actions.

¶36 Johnson was a nonprobationary teacher with over twenty years' experience. For most of her career, she had received good evaluations. In 2008, however, an assistant principal at her school recommended that she be dismissed, and the District accepted that recommendation.

¶37 Johnson challenged this decision under the Teacher Employment, Compensation, and Dismissal Act of 1990, §§ 22-63-101 to -403, C.R.S. (2017) ("TECDA"), and an administrative law judge ("ALJ") concluded that no just cause existed for Johnson's dismissal. In particular, the ALJ found the assistant principal's conclusions to be unsupported and that those conclusions relied on questionable data. The ALJ further found that the assistant principal's testimony contained a number of inconsistencies.

¶38 As a result of the ALJ's ruling, at the end of the 2008–09 school year, Johnson returned to the classroom, although she was told that her placement was for one year.

¶39 Johnson remained in this placement through the 2010–11 school year, and in 2011–12, she taught at a different school. Again, prior to her placement at the new school, she was told that the placement was for one year.

¶40 Thereafter, in July 2012, the District told Johnson that she was being placed on indefinite leave, effective September 1, 2012, if she did not obtain a mutual consent position by August 26, 2012. When Johnson did not obtain such a position, she was placed on indefinite unpaid leave.

¶41 Johnson subsequently sued the District in state court, and the District removed the case to federal court. After the federal district court dismissed Johnson's claims, she appealed to the Tenth Circuit, and that court certified the questions now before us.

## II. Analysis

¶42 I begin by addressing the applicable standard of review and rules of statutory construction. I then discuss section 22-63-202(2)(c.5) and explain why I believe that teacher displacements under that section are limited to the circumstances set forth in section 22-63-202(2)(c.5)(VII).

### A. Standard of Review and Rules of Statutory Construction

¶43 We review questions of statutory interpretation de novo. Vallagio at Inverness Residential Condo. Ass'n v. Metro. Homes, Inc., 2017 CO 69, ¶ 16, 395 P.3d 788, 792. In doing so, we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings. Id. When the statutory language is clear, we apply it as written and need not resort to other rules of statutory construction. Id.

21

¶44     When, however, the statutory language is ambiguous, we may examine the legislative intent, the circumstances surrounding the statute's adoption, and the possible consequences of various interpretations to determine the proper construction of that statute.  Coffman v. Williamson, 2015 CO 35, ¶ 23, 348 P.3d 929, 936.  A statute is ambiguous if it is reasonably susceptible of multiple interpretations.  Id.

## B.  Section 22-63-202(2)(c.5)

¶45     Section 22-63-202(2)(c.5) concerns teacher employment contracts.

¶46     At first blush, section 22-63-202(2)(c.5)(I) appears to give school principals substantial discretion over teacher placements.  That subsection provides:

> The general assembly finds that, for the fair evaluation of a principal based on the demonstrated effectiveness of his or her teachers, the principal needs the ability to select teachers who have demonstrated effectiveness and have demonstrated qualifications and teaching experience that support the instructional practices of his or her school. Therefore, each employment contract executed pursuant to this section shall contain a provision stating that a teacher may be assigned to a particular school only with the consent of the hiring principal and with input from at least two teachers employed at the school and chosen by the faculty of teachers at the school to represent them in the hiring process, and after a review of the teacher's demonstrated effectiveness and qualifications, which review demonstrates that the teacher's qualifications and teaching experience support the instructional practices of his or her school.

¶47     Notably, however, this subsection speaks in terms of a principal's authority over the ability to "select" and "assign[]" teachers during the hiring process.  See id.  It says nothing about displacing teachers or withdrawing consent after a teacher is placed.  See id.

¶48 Section 22-63-202(2)(c.5)(III) then provides procedures concerning teachers displaced for the reasons set forth in section 22-63-202(2)(c.5)(VII). Section 22-63-202(2)(c.5)(III) provides, in pertinent part:

> (A) Any active nonprobationary teacher who was deemed effective during the prior school year and has not secured a mutual consent placement shall be a member of a priority hiring pool, which priority hiring pool shall ensure the nonprobationary teacher a first opportunity to interview for a reasonable number of available positions for which he or she is qualified in the school district.
>
> (B) When a determination is made that a nonprobationary teacher's services are no longer required for the reasons set forth in subparagraph (VII) of this paragraph (c.5), the nonprobationary teacher shall be notified of his or her removal from the school. . . . Upon notice to the nonprobationary teacher, the school district shall immediately provide the nonprobationary teacher with a list of all vacant positions for which he or she is qualified, as well as a list of vacancies in any area identified by the school district to be an area of critical need. An application for a vacancy shall be made to the principal of a listed school, with a copy of the application provided by the nonprobationary teacher to the school district. When a principal recommends appointment of a nonprobationary teacher applicant to a vacant position, the nonprobationary teacher shall be transferred to that position.

¶49 Section 22-63-202(2)(c.5)(IV) immediately follows subsection (2)(c.5)(III), and it concerns those displaced teachers who are unable to secure a mutual consent placement within a certain period of time. That section provides, as pertinent here:

> If a nonprobationary teacher is unable to secure a mutual consent assignment at a school of the school district after twelve months or two hiring cycles, whichever period is longer, the school district shall place the teacher on unpaid leave until such time as the teacher is able to secure an assignment.

¶50 Lastly, section 22-63-202(2)(c.5)(VII) provides, "This paragraph (c.5) shall apply to any teacher who is displaced as a result of drop in enrollment; turnaround;

23

phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution."

¶51    In my view, this statutory scheme is susceptible of at least two reasonable interpretations.

¶52    First, as Johnson asserts, the statute can be read so that subsection (2)(c.5)(I) applies solely to _initial_ placements and hiring decisions, and thus, a nonprobationary teacher can be displaced solely for the reasons set forth in subsection (2)(c.5)(VII).

¶53    Second, as the District asserts, the statute can be read to give the principal authority at all times and for any reason to withdraw consent to the teacher's placement. If, however, the teacher has remained effective, then subsection (2)(c.5)(III) provides the displaced teacher with certain additional rights and protections.

¶54    Because both of these constructions are reasonable, I believe that the statute is ambiguous. Accordingly, I turn to the statute's legislative history and the settled rules of statutory construction set forth above to discern the legislature's intent.

¶55    The legislative history of section 22-63-202(2)(c.5) reveals that subsection (2)(c.5)(VII) was added to clarify the circumstances in which a teacher can be placed on indefinite leave without pay. Specifically, as introduced, the bill proposing what is now section 22-63-202(2)(c.5) contained broad language (1) allowing teachers to be assigned to a particular school only with the consent of the receiving school and (2) providing that if the teacher was unable to secure an assignment after two hiring cycles, then the school district would place the teacher on unpaid leave until the teacher could secure an assignment. See S.B. 10-191, 67th Gen. Assemb., 2d Reg. Sess. (Colo. 2010) (introduced

24

Apr. 12, 2010). Later amendments to the bill, however, and most notably the addition of subsection (2)(c.5)(VII), limited the circumstances in which a teacher could be placed on indefinite leave to those in which the displacement was due to conditions at the school, such as a drop in enrollment or a building closure.

¶56 The legislative history further reflects that in adding subsection (2)(c.5)(VII), the legislature intended to pattern the Colorado statute after the collective bargaining agreement that had been adopted in Chicago. See S.B. 10-191 Amendment Summary. The mutual consent provisions in the Chicago collective bargaining agreement applied only to teachers displaced by general school-based reductions, as, for example, the closure of a program or a drop in enrollment. See Agreement between the Board of Education of the City of Chicago and the Chicago Teachers Union, Local No. 1 (July 1, 2007-June 30, 2012), at App. H, at 224, https://perma.cc/UP6N-LRN7. Consistent with those provisions, subsection (2)(c.5)(VII) provided for similar school-based displacements.

¶57 Lastly, the legislative history of the statute makes clear that subsection (2)(c.5)(I)'s mutual consent provision was concerned with the hiring of teachers and not their displacement. For example, Senator Michael Johnston, who co-sponsored the bill, testified to the importance of having teachers "placed into positions by mutual consent, which is to say that we think teachers ought to be able to have a choice in the assignment they take." Hearing on S.B. 191 before the S. Educ. Comm., 67th Gen. Assemb., 2d Reg. Sess., at 8 (Apr. 21, 2010) (statement of Sen. Michael Johnston) (emphasis added). Likewise, Denver Superintendent Tom Boasberg testified that he

strongly supported "this bill's insistence upon mutual consent in <u>hiring</u> of teachers" and noted that "the voluntary <u>hiring</u> principle is absolutely fundamental." Hearing on S.B. 191 Before the H. Educ. Comm., 67th Gen. Assemb., 2d Reg Sess., at 77 (May 6, 2010) (statement of Superintendent Tom Boasberg) (emphasis added).

¶58 Accordingly, the legislative history of section 22-63-202(2)(c.5) tends to support Johnson's view that subsection (2)(c.5)(I) applies solely to <u>initial</u> placements and hiring decisions and thus, a nonprobationary teacher can be displaced solely for the reasons set forth in subsection (2)(c.5)(VII).

¶59 In addition to the foregoing, in my view, Johnson's interpretation properly harmonizes all of the provisions of section 22-63-202(2)(c.5), whereas the District's interpretation, which the majority here adopts, is inconsistent with subsection (2)(c.5)(VII) and renders that subsection superfluous.

¶60 As noted above, subsection (2)(c.5)(VII) states, "This paragraph (c.5) [i.e., the <u>entirety</u> of section 22-63-202(2)(c.5)] shall apply to <u>any</u> teacher who is displaced as a result of drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution." (Emphasis added.) The District's interpretation, however, would read section 22-63-202(2)(c.5) to apply to any teacher displaced for any reason. In my view, such a reading is inconsistent with subsection (2)(c.5)(VII), and neither the District nor the majority explains how its interpretation squares with that subsection.

¶61 Moreover, if the District's interpretation were correct, then subsection (2)(c.5)(VII) would be superfluous. Specifically, if a teacher could be placed on

indefinite unpaid leave at any time and for any reason, then subsection (2)(c.5)(VII) would be wholly unnecessary. We, however, strive to avoid constructions that will render statutory terms superfluous. See Kinder Morgan CO2 Co. v. Montezuma Cty. Bd. of Comm'rs, 2017 CO 72, ¶ 24, 396 P.3d 657, 664.

¶62 Finally, if the District's interpretation were correct, then section 22-63-202(2)(c.5) would allow a district to do an end run around the extensive termination-for-cause provisions set forth in sections 22-63-301 and -302, C.R.S. (2017). Specifically, rather than complying with those termination-for-cause provisions, a district could simply withdraw consent for a teacher's placement and place that teacher on indefinite leave without pay, which, as a practical matter, would effectively terminate the teacher's employment. I do not believe that the legislature adopted substantial and detailed termination-for-cause protections for teachers, on the one hand, only to provide so ready a means for evading them, on the other.

¶63 In reaching this conclusion, I am unpersuaded by the majority's view that interpreting the statute as Johnson does (an interpretation with which I agree) would render the reference in subsection (2)(c.5)(III)(B) to subsection (2)(c.5)(VII) superfluous, which we may not do. See maj. op. ¶ 20. The majority reasons that if subsection (2)(c.5)(VII) applies to all of section (2)(c.5), then referring to subsection (2)(c.5)(VII) in subsection (2)(c.5)(III)(B) is unnecessary. See id. I, however, agree with Johnson's view that although the reference to subsection (2)(c.5)(VII) may be redundant, it is not superfluous. Rather, that reference simply reaffirms the kinds of displacements to which section (2)(c.5) is directed. Indeed, the very next sentence of subsection

27

(2)(c.5)(III)(B) confirms this interpretation. That sentence begins, "In making decisions pursuant to this paragraph (c.5) . . . ." (Emphasis added.) The sentence thus refers to section (2)(c.5) as a whole and therefore supports Johnson's view that subsection (2)(c.5)(VII) applies to the entirety of section (2)(c.5).

¶64 In contrast, the majority's interpretation would lead to potentially illogical or absurd results. Under the majority's apparent view, only teachers displaced for the reasons set forth in subsection (2)(c.5)(VII), and not teachers displaced for some other reason, would receive notice of their removal from a school. I, however, perceive no reason why only certain displaced teachers would receive notice of their displacement, and the majority offers none. See Frazier v. People, 90 P.3d 807, 811 (Colo. 2004) (noting that we will not follow a statutory interpretation leading to an illogical or absurd result).

¶65 I likewise am unpersuaded by the majority's view that Johnson's interpretation of section (2)(c.5) leads to illogical or absurd results. See maj. op. ¶ 19. The majority opines that under Johnson's interpretation, a school would not have to accept a nonprobationary teacher who had been displaced as a result of a drop in enrollment but would have to accept a teacher who was displaced for cause and that such a result would be absurd. See id. I, however, respectfully disagree with the majority's premise. Contrary to the majority's view, as noted above, sections 22-63-301 and -302 authorize terminations for cause, subject to the detailed procedures set forth in those provisions. Accordingly, a school would not have to accept a teacher for whom cause to terminate exists. Rather, the district could employ the statutory procedures for terminating the

28

teacher for cause. Not only is such a result neither illogical nor absurd, but also it harmonizes all of the pertinent provisions of TECDA: if cause exists to terminate a teacher, then the district can do so, subject to the provisions of sections 22-63-301 and -302; short of grounds to terminate for cause, however, a nonprobationary teacher who is employed in a school pursuant to a mutual consent placement may be displaced only for the reasons set forth in section 22-63-202(2)(c.5)(VII).

## III. Conclusion

¶66 For these reasons, I agree with the majority's conclusion that Johnson was not deprived of a state property interest in this case. Unlike the majority, however, I believe that under section 22-63-202(2)(c.5), a nonprobationary teacher like Johnson, who was assigned to a school upon the mutual consent of the school and herself, may only be displaced for the reasons set forth in section 22-63-202(2)(c.5)(VII).

¶67 Accordingly, I respectfully concur in part and dissent in part from the majority's opinion.

I am authorized to state that JUSTICE HOOD and JUSTICE HART join in this concurrence in part and dissent in part.